UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-2

Brett Wiltsey (BW6614)
Scott J. Freedman (SF7681)
Benjamin W. Spang (BS3439)
DILWORTH PAXSON LLP
457 Haddonfield Road, Suite 700
Cherry Hill, NJ 08002
(856) 675-1900

*Attorneys for TD Bank, N.A.*

| | | |
|---|---|---|
| *In re:* | : | |
|    HovBros Burlington, LLC, | : | Case No. 16-13892 (JNP) |
|               Debtor, | : | Chapter:   11 |
| | : | |
| *In re:* | : | |
|    HovBros Fries Mill, LLC, | : | Case No. 16-13893 (JNP) |
|               Debtor, | : | Chapter:   11 |
| | : | |
|    and | : | |
| | : | |
| *In re:* | : | Case No.: 16-13894 (JNP) |
|    Sunrise/Hovcare, L.P., | : | Chapter:   11 |
|               Debtor. | : | |

## OBJECTION OF TD BANK, N.A. TO THE JOINT PLAN OF REORGANIZATION OF HOVBROS BURLINGTON, LLC, HOVBROS FRIES MILL, LLC AND SUNRISE/HOVCARE, LP DATED JUNE 17, 2016

TD Bank ("TD" or "the Bank") hereby objects to the joint plan of reorganization ("the Plan") proposed by HovBros Burlington, LLC ("Burlington"); HovBros Fries Mills, LLC ("Fries Mills"); and Sunrise/Hovcare, L.P. ("Sunrise" and collectively, with Burlington and Fries Mills, "the Debtors") on June 17, 2016.  In support of this objection, TD avers as follows:

## I.    BACKGROUND

1.    The Debtors are three special purpose real estate holding companies, which own real estate in Deptford, Burlington, Westampton and Monroe Townships.  The Debtors, with

approximately thirty (30) other affiliated real-estate related entities, operate under the umbrella of the "Hovnanian Organization," the principals of which are Peter J. Hovnanian and Stephen J. Hovnanian.

2.      On March 2, 2016, shortly before the foreclosure auction of the Debtors' real estate, the Debtors filed Chapter 11 proceedings with this Court.

3.      The Debtors contend the purpose of these bankruptcy cases is to reorganize the Hovnanian Organization. [Burlington Docket No. 19, page 5].  Notwithstanding those assertions, however, only the Debtors have filed for relief though a fourth entity, HovBros Roesville, LLC, will apparently be filing prior to July 7, 2016 (the scheduled date of its foreclosure sale).

4.      These cases are neither jointly administered nor substantively consolidated.

5.      TD is the holder of secured claims against the Debtors in the approximate amount of $19 million (the "TD Claim").  The Debtors contend that the value of the collateral securing the TD Claim – a majority of which is owned by non-debtor affiliates – is approximately $23.7 million.

6.      By motions dated March 11, 2016 ("the Motion to Dismiss"), TD has requested that these Chapter 11 cases be dismissed, or, alternatively, the automatic stay be lifted.

7.      As per their respective Schedules of Assets and Liabilities and Statements of Financial Affairs, the Debtors are not currently operating and have little or no cash or other non-real estate assets and few if any creditors other than TD.

8.      As per the Case Management Order No. 1 entered on May 26, 2016, each of the Debtor's cases is a single asset real estate case ("SARE") under 11 U.S.C. § 101(51B).

9.      On June 17, 2016, the Debtors filed the Plan and related disclosure statement. Objections to the Plan are due on July 1, 2016.  Confirmation is scheduled for August 4, 2016.

## II.    OBJECTION

10.    The Plan fails to meet the requirements of Section 1129 of the Bankruptcy Code and therefore should not be confirmed.

11.    To confirm the Plan, the Court must find that both the Plan and the Debtors are in compliance with each of the requirements of Section 1129(a) of the Bankruptcy Code.  *In re Lackawanna Detective Agency, Inc*., 82 B.R. 336, 337 (Bankr. D. Del. 1988).  The plan proponent bears the burden of establishing the plan's compliance with each of these requirements.  *In re Greate Bay Hotel & Casino, Inc.,* 251 B.R. 213, 221 (Bankr. D. N.J. 2000). As set forth below, in the order of statutory number under Section 1129, the Plan fails to meet the requirements of § 1129(a) and (b) of the Bankruptcy Code and therefore confirmation should be denied.

### A.    The Plan Fails to Properly Classify Claims and Does Not Comply With all Applicable Code Provisions - 11 U.S.C. § 1129(a)(1)

12.    Pursuant to Section 1129(a)(1), a plan must comply with the "applicable provisions" of the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  The legislative history of Section 1129(a)(1) explains that this provision encompasses the requirements of Sections 1122 and 1123 governing classification of claims and contents of the plan, respectively.  *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 126 (1978).

13.    Here, the Plan fails to properly classify claims and contains other impermissible provisions.

### (1)    *The Plan does not properly classify claims*

14.    The Plan provides for the creation of eight (8) classes of claims.  The TD Claim is characterized as fully secured and included in Plan Class 1.  No provision is made for the TD Claim in the event it is undersecured.

15.     The Plan further provides for claims of the four townships in which the real property owned by each of the Debtors is located.  No provision is made, though, for the treatment of the holders of tax certificates against the Debtors' properties.[1]

16.     The Plan further provides for the treatment of a claim held by Mr. and Mrs. DeCecco (Class 6) and identifies it as a secured claim.  The real property at 2311 Mount Holly Road in the township and county of Burlington, NJ (Block 132.02, Lot 8.01) allegedly securing the claim, however, appears to have been transferred by Burlington to non-debtor affiliate Penn Realty, LLC on or about July 22, 2011 for $1.  If so, this claim should be included in Class 7, the general unsecured claims.

17.     In addition, although not referenced in their respective Schedules, Burlington's and Sunrise's monthly operating reports reference intercompany accounts receivables in the approximate amounts of $14.7 million and $4.2 million, respectively, that, if due from other Debtors, must be classified and treated.

18.     Similarly, Burlington's unscheduled obligation in the original principal amount of $13,230,000 to Fulton Bank claim must also be classified and treated under the Plan.

        *(2)     The Plan Fails to Comply With Section 1123*

19.     Under Section 1123(a), a plan must:  (i) designate classes of claims (other than certain priority claims) and interests; (ii) specify any class of claims or interests that is not impaired under the plan; (iii) specify the treatment of any class of claims or interests that is impaired under the plan; (iv) provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest; (v) provide adequate means for the plan's implementation; (vi)

---

[1] Upon information and belief, there are tax certificates held by various parties with respect to Burlington's real property regarding the 2014 tax year the aggregate costs of which are $43,314.68.

provide, among other things, for the inclusion in the charter of a corporate debtor, a provision prohibiting the issuance of non-voting equity securities; and (vii) contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director or trustee under the plan and any successor to such officer, director or trustee.

20.    In the case at bar, it is unclear whether the Plan includes all such provisions. Among other things, the Plan fails to provide for the treatment of all claims against the Debtors, reference and account for significant intercompany receivables and all known claims, and (as set forth below) provide adequate means for its implementation.

21.    As it would liquidate a majority of the estates' property and distribute millions of dollars, the Plan also needs to provide for a fully bonded disbursing agent.

> (3)    *The Plan Includes Overly Broad and Improper Injunction, Release and Discharge Provisions*

22.    Failure to comply with Section 524(e) is also a basis for denying confirmation. *In re Elsinore Shore Associates*, 91 B.R. 239 (Bankr. D. N.J. 1988).[2]

23.    In its pertinent part, the Plan provides that various non-debtor entities, which are also obligated to TD, will sell or develop their real estate and distribute the proceeds to TD in satisfaction of the claims of TD against the entity making the payments. *See, e.g.*, Plan, § 4,(d). TD's claims against those entities though, exceed the payment amount and hence, the Plan violates Section 524.

---

[2]  Section 524(e) provides that "discharge of a debt of the debtor does not affect the inability of any other entity on, or the property of any other entity for, such debt. " 11 U.S.C. § 524(e).  This Section of the Code has been used to disallow provisions in plans of reorganization that impose on plan participants, releases, covenants not to sue, and waivers or their functional equivalents that would benefit parties other than the debtor.

24.     The Plan also seeks to enjoin TD from pursuing claims against non-debtors and asserting set off, recoupment and other rights against the Debtors.  [Plan §§ 4.1(f), 9.1(a),(e).]

25.     The Debtors must also fairly establish the necessity of and all other requirements for extension of the automatic stay or creation of post confirmation injunctions.   The stated purpose and "clear language of Section 362(a) indicates that it stays only proceedings against the 'debtor'-the term used by the statute itself."  *Maritime Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991); accord *McCartney v. Integra National Bank North*, 106 F.3d 506, 509 (3d Cir. 1997) ("Although the scope of the automatic stay is broad, the clear language of Section 362(a) stays actions only against a 'debtor'").

26.     It follows, therefore, that the automatic stay generally does not operate to stay claims against non-debtor defendants. *Am. Prairie Const. Co. v. Hoich*, 560 F.3d 780, 789 (8th Cir. 2009) ("It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants."); *In re TXNB Internal Case*, 483 F.3d 292, 301 (5th Cir. 2007) ("Section 362(a) ... does not apply, however, to actions not directed against the debtor or property of the debtor.")

27.     The stay is not, therefore, available to non-debtor co-defendants even where they are in a similar legal or factual nexus with the debtor. *Maritime Co*., 959 F.2d at 1205.  Thus, the stay "may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the ... debtor." *McCartney*, 106 F.3d at 509-10.   Non-debtor co-defendants are not protected by a debtor's automatic stay even where they share a similar factual or legal nexus with the debtor. *Maritime Co*., 959 F.2d at 1205

28.      The Plan also includes overly broad exculpation provisions.  *See In re PWS Holding Co.*, 228 F.3d 224 (3d Cir. 2000); *In re Continental Airlines*, 203 F.3d 203, 211 (3d Cir. 2000) (a plan cannot effect a discharge of non-debtor directors and officers).

*(4)      The contemplated DIP would also violate the Bankruptcy Code*

29.      The Debtors, with no ongoing operations or assets other than undeveloped real property, lack the resources and must rely on other sources to fund their reorganization efforts and the proposed distributions under the Plan.  Acknowledging this, the Debtors – first in their response to the Motion to Dismiss and most recently in the Plan and the disclosure statement – allude to debtor-in-possession financing in the principal amount of $4.75 million from an unknown lender, secured by unnamed collateral and based on unspecified terms ("the DIP financing").  *See e.g.*, Plan, ¶ 6.8 ("The Debtors will obtain Debtors-in-Possession Financing which will enable them to complete two development projects by the Burlington Debtor and the Fries Mill development project.")

30.      Although it reserves its rights to object to the DIP financing if and when it is presented to the Court and creditors, TD submits that any such submission in connection with the Plan or otherwise is or would not be legally permissible.  Specifically, the DIP financing is predicated on the Court permitting liens on property of the Debtors' estates.  *See* 11 U.S.C. § 364(c), (d).  By virtue of the Plan revesting all property of the estates back into the Debtors, however, there would be no estate property to which a lien could attach.  *See* 11 U.S.C. § 1141(b).  As such, the DIP Financing is not available in the plan or post confirmation context. *See In re Hickey Properties, Ltd.*, 181 B.R. 173 (Bankr. D. Vt. 1995).

31.    Moreover, the Debtors cannot and will not be able to demonstrate a right to prime TD's interests in the Debtors' property.[3]    "[G]ranting post-petition financing on a priming basis is extraordinary and is allowed only as a last resort." *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010).

32.    Pursuant to Section 364(d)(1) of the Bankruptcy Code, a debtor-in-possession may obtain credit secured by priming liens on estate property only if unable to obtain credit elsewhere and there is adequate protection of the interest of the holder of the lien on such property is proposed to be granted.

33.    The debtor has the burden of proving that adequate protection, the "indubitable equivalent" of the secured lender's original lien, has been provided.  *Id.* n.44; 11 U.S.C. § 361(3).  Adequate protection "should as nearly as possible under the circumstances of the case provide the creditor with the value of his bargained for rights." *Resolution Trust Corp. v. Swedeland Dev. Corp. (In re Swedeland Dev. Corp.)*, 16 F.3d 552, 564 (3d Cir. 1994).

34.    Protection is adequate if it "provide[s] the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing." *Id.*

35.    The debtor must ground its proof of adequate protection in fact. *In re Mosello*, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996) ("A finding of adequate protection should be premised on facts, or on projections grounded on a firm evidentiary basis.").

---

[3] TD also submits the Court lacks the jurisdiction to authorize the priming of TD's security interests in property owned by the Debtors' non-debtor affiliates. Section 364(d), which deals with priming liens, only authorizes priming liens on property of the estate.

36.     In this case, the theoretical DIP financing will be used by Burlington and Fries Mill to complete development projects.  Presumably, the Debtors' will rely on TD's perceived equity cushion in and increased value resulting from the development of the collateral as sufficient adequate protection to justify the priming of TD's security interests.  Whether a secured party is adequately protected through an equity cushion turns upon the valuation of the collateral as compared to the outstanding secured indebtedness.

37.     A security interest is to be valued "in light of the purpose of the valuation and of the proposed disposition or use of [the] property..." 11 U.S.C. § 506(a).  Courts must determine value on a case-by-case basis, taking into account the facts of each case and the competing interests of the case.  *See In re Tenney Village Co.*, 104 B.R. 562, 567 (Bankr. N.H. 1989).

38.     In determining whether adequate protection exists by virtue of an equity cushion, courts have routinely held that an equity cushion in excess of 20% must be proven. *In re Kost*, 102 B.R. 829 (D. Wyo. 1989) citing *In re San Clemente Estates*, 5 B.R. 605 (Bankr. S.D. Cal. 1980) (holding 65% adequate); *In re Nashua Trust Co.*, 73 B.R. 423 (Bankr. D. N.J. 1987) (holding 50% adequate); *In re Ritz Theatres*, 68 B.R. 256 (Bankr. M.D. Fla. 1987) (holding 38% adequate).  Compare *SunTrust Bank v. Den-Mark Construction, Inc.,* 406 B.R. 683, 686-87 (E.D.N.C. 2009) (vacating Order approving 364(d) financing motion where appellate court concluded that equity cushion was small (4.55%) and enhancement in value was too speculative).

39.     Moreover, to the extent a debtor is unable to present a plan of reorganization with a reasonable prospect of success, the equity cushion must be calculated based upon the liquidation value of the collateral.  *In re KeyStone Camera Prod. Corp.*, 126 B.R. 177, 185 (Bank. D. N.J. 1991) (Court adopted a forced sale liquidation value utilized when evaluating

adequate protection under Section 364(d) where the debtor's reorganization prospects were dim).

40.    Applied here, other than a reference as to TD's alleged valuation, the Plan includes no reference let alone justification for the value of TD's collateral, a prerequisite to determine whether and the extent to which TD may have an equity cushion.  Given the interest continuing to accrue on the TD Claim and tax sale certificates, the Debtors' inability or unwillingness to pay real estate taxes and other carrying costs on an ongoing basis and the prospect of imposing liquidation value to evaluate adequate protection, it is unlikely TD possesses any equity cushion in the collateral, let alone cushion, sufficient to satisfy applicable case law.

41.    Additionally, in the real estate context, courts have generally found that continuing construction on an unfinished project does not, in itself, provide adequate protection. Indeed, where the successful rehabilitation of the project is "highly speculative" and the equity cushion at the debtor level is "tenuous at best," priming is inappropriate.  *YL West 87th Holdings I*, 423 B.R. at 442-44 (comparing cases with certainty and where speculation is involved); *Suntrust Bank*, 406 B.R. at 702 (holding that where the debtor had not lined up necessary further funding and had a thin equity cushion in case of failure, priming was inappropriate); *Swedeland Dev. Corp.*, 16 F.3d at 566 ("Those cases which have considered improvements to be adequate protection have done so only when the improvements were made in conjunction with the debtor's providing additional collateral beyond the contemplated improvements."); 3 COLLIER ON BANKRUPTCY, *supra*, ¶ 364.05[1] ("When the effect of the new borrowing is merely to pass the risk of loss to the holder of the existing lien, the request for authorization should be denied absent the lien holder's consent.").

*(5)    The Proposed Interest Rate on the TD Claim is Insufficient*

42.    Although not referenced in the Plan directly, the Debtors' presumably propose to pay interest on the TD Claim at the rate of 4%.  [Plan Exhibit A, page 8].  To the extent that *Till* dictates the applicable rate, it requires that the Court determine the appropriate interest rate using the formula of prime plus a risk factor.[4]

43.    Here, TD submits that the prime rate (currently 3.5%) be enhanced by the maximum permissible amount.[5]  Among other things, the Plan does not provide for periodic payments, but rather the Plan is a negative amortization plan which calls for lump sum payments when and if the various properties are developed or sold.  In some instances, the lump sums are due in several years, and only after a buyer is located.  In other instances, repayment must await development and build out of the property and repayment of additional financing.

44.    In other instances the buyers are relying on contracts that, by their terms, have expired.  Finally, the Court should consider the speculative nature of this Plan and lack of specificity associated with the projections in concluding that a maximum risk factor is appropriate.

**B.    The Debtors Have Not Complied with the Disclosure Requirements – 11 U.S.C. §129(a)(2)**

45.    Section 1129(a)(2) requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.  11 U.S.C. § 1129(a)(2).  This provision is intended to encompass the disclosure and solicitation requirements under Sections 1125 and 1126.  *See In re Resorts Int'l, Inc.,* 145 B.R. 412, 468-69 (Bankr. D. N.J. 1990).

---

[4] To that end, the Court should consider the Debtors are proposing to pay the DIP at 6%, while paying TD, with its presumably primed liens, at 4%.

[5] TD submits that the *TILL* decision does not contemplate a rate of prime plus a risk factor of 0.5%.

46.     Here, there appear to be a number of material non-disclosures (or insufficient disclosures) that would warrant confirmation being denied.[6]  The disclosure deficiencies include:

- Lack of meaningful projections;

- No disclosure of intercompany receivables of $14.7 million due Burlington (per MOR) and $4.2 million due Sunrise (per MOR);

- The interest rate proposed to be paid to TD under the Plan;

- Post-petition payments made by or on account of the Debtors to select creditors;

- The Fulton Bank obligation;

- The assets and liabilities of the general partners of Hovcare;

- The details regarding the proposed DIP financing; and

- Anticipated litigation and claims held by the estates.[7]

**C.      The Debtors Must Establish That The Plan Has Been Proposed In Good Faith And Not By Any Means Forbidden By Law - 11 U.S.C. §1129 (a)(3)**

47.     Section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The good faith standard requires that a plan be "proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code."  *In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999) (quoting *In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D. N.J. 1988), aff'd in part, 103 B.R. 521 (D. N.J. 1989), aff'd, 908  F.2d 964 (3d Cir. 1990)).

---

[6] Objections to the disclosure statement are due on July 10, 2016 and TD will provide additional objections at that time.

[7] In addition to the transfer of the Mount Holly Road property referenced above, Burlington also transferred property in Burlington township (Block 123, Lots 3 and 4) on September 13, 2013 to non-debtor affiliate Drexel Realty LLC for $1.

48.    "Though the term 'good faith,' as used in Section 1129(a)(3), is not defined in the Bankruptcy Code, …the term is generally interpreted to mean that there exists 'a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re Combustion Engineering, Inc.*, 391 F.3d 190, 246-47 (3rd Cir. 2004) (citations omitted).  The requirement of good faith "must be viewed in light of the totality of the circumstances surrounding establishment of a Chapter 11 plan." *In re Piper Aircraft Corp.,* 244 F.3d 1289, 1300 (11th Cir. 2001) (citation omitted).

49.    The primary goal of Chapter 11 is to promote the rehabilitation of debtors. Congress has recognized that the continuation of the operation of a debtor's business as a viable entity benefits the national economy through the preservation of jobs and continued production of goods and services. The Supreme Court similarly has recognized that "[t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources." *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984).

50.    Here, the Debtors have no employees and no current operations.  And, as set forth in greater detail in connection with the Motion to Dismiss, TD submits that, despite this being portrayed as the reorganization of the Hovnanian Organization, these cases really constitute nothing more than an attempt to delay the foreclosure of the real estate owned by a microcosm of the larger enterprise.

51.    The Plan as proposed and the lack of disclosure bolster the bad faith conclusion.

**D.** **The Plan Does Not Make Sufficient Disclosures Regarding Directors, Officers and/or Voting Trustees - 11 U.S.C. § 1129(a)(5)**

52.     Section 1129(a)(5) of the Bankruptcy Code requires: (i) that the proponent of a plan disclose the identity of any individual proposed to serve after confirmation as a director, officer, or voting trustee of the Debtor; (ii) that the appointment of such individuals be consistent with the interests of creditors and shareholders and with public policy; and (iii) that the proponent disclose the identity of any insider that will be employed by the reorganized Debtor and the nature of the compensation to be provided to such insider.  11 U.S.C. § 1129(a)(5).

53.     Here, the Plan makes no reference to the identity and compensation proposed for officers or directors going forward.  Rather, it only states that the business and financial affairs of the reorganized debtors will be managed and controlled by the senior managers of the reorganized debtors.  Plan, ¶¶ 6.9, 2.37.  In addition, it must be shown that the retention of these individuals is in the best interest of the creditors in this case.

**E.** **The Plan Has Not Been Shown To Be In The Best Interest of Creditors and Equity Holders - 11 U.S.C. § 1129(a)(7)**

54.     Section 1129(a)(7) of the Bankruptcy Code requires that, with respect to each impaired class of claims or interests, each holder of a claim or interest of such class must either (i) accept the plan or (ii) receive or retain property having a present value, as of the effective date of the plan, not less than the amount such holder would receive or retain if the debtor were liquidated in a hypothetical liquidation under chapter 7 of the Bankruptcy Code.  *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441-42, 442 n. 13 (1999); *Toibb v. Radloff*, 501 U.S. 157, 164-65 (1991).

55.     Here, because the Debtors have failed to attach a liquidation analysis, the Plan is not in compliance with § 1129(a)(7).  TD reserves the its right to object to any such analysis to the extent that one is provided.

**F.     The Debtors Will Be Unable to Demonstrate the Acceptance of Each Impaired Class - 11 U.S.C. § 1129(a)(8)**

56.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired.   11 U.S.C. § 1129(c)(8).   Pursuant to Section 1126(c), a class of impaired claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of the claims in that class actually vote to accept the plan.  11 U.S.C. § 1126(c).

57.     A class that is not impaired under a plan, and each holder of a claim or interest in such class, is conclusively presumed to have accepted the plan.  11 U.S.C. § 1126(g).

58.     As TD will not be voting in favor of the Plan, the Debtors cannot satisfy Section 1129(a)(8).

**G.     The Plan Improperly Treats Tax Claims - 11 U.S.C. § 1129(a)(9)**

59.     The Plan's treatment of the tax claimants, Classes 2 through 5, does not comply with Sections 1129(c) and (d) and Section 507(a)(8) as it fails to provide for regular installment payments over a period not more than five (5) years.

**H.     The Debtors Will Be Unable to Establish Acceptance by an Impaired Class - 11 U.S.C. § 1129(a)(10)**

60.     Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent that there is an impaired class of claims, at least one impaired class of claims must accept the plan, excluding acceptance by an insider.  *See* 11 U.S.C. § 1129(a)(10); s*ee also In re Economy Cast Stone Co*., 16 B.R. 647, 651 (Bankr. E.D. Va. 1981) (at least one impaired class must actively accept the plan).

61.     Significantly, and despite the portrayal of these proceedings as the reorganization of the Hovnanian Organization, the Plan does not provide for substantive consolidation.   As such, in order for the Plan to satisfy Section 1129(a)(10), acceptance by an impaired class must

be found to have occurred as to each Debtor. *In re Tribune Company*, 464 B.R. 126, 180 (Bankr. D. Del. 2011) (finding Section 1129(a)(10) unambiguous on the issue); *In re JER/Jameson Mezz Borrower II, LLC*, 461 B.R. 293, 302 (Bankr. D. Del. 2011).

62.     Here, the purportedly secured real estate tax claimants, which are to receive 100% of their allowed claims after designated sales, are not impaired creditors entitled to vote on the Plan. *See, e.g., In re Equitable Dev. Corp.*, 196 B.R. 889, 898 (Bankr. S.D. Ala. 1998).

63.     Issues also exist as to whether there any impaired classes other than TD. Indeed, other than their respective unimpaired tax claims and liability as to the TD Claim, Fries Mill and Sunrise have no other creditors other than a *de minimi*s unsecured claims of less than $85,000 and $5,000, respectively. For its part, Burlington scheduled general unsecured claims in the aggregate amount of $595,071.03, of which $554,379.22 relates to the claim held by the Estate of Jirair S. Hovnanian, an insider of the Debtors. To the extent they are allowed, these *de minimis* non-insider claims should not qualify as an accepting class of impaired claims.[8]

64.     Given that the property tax claimants are not impaired or otherwise entitled to vote on the Plan and the *de minimis* nature of any unsecured claims, the Debtors are unable to satisfy Section 1129(a)(10) on a debtor-by-debtor basis as required or on a joint basis as proposed.

---

[8] Alternatively, TD submits that the Plan artificially impairs certain classes, which thereby prohibits their votes from counting for Section (a)(10) purposes. Specifically, despite their designation in the Plan to the contrary, secured tax creditors in Classes 2 through 5 and Class 7 general unsecured creditors – all of whom are to be paid 100% of their allowed claims either after property sales or before December 31, 2021 – are not impaired. *Matter of Windsor on the River Associates, Ltd.*, 7 F.3d 127 (8th Cir. 1993) (Court, in rejecting SARE plan that impaired a $13,000 class of trade creditors by delaying payment for 60 days after the plan's effective date where there was more than $600,000 equity in the debtor's apartment complex and the impairment was solely to satisfy § 1129(a)(10), found that "a claim is not impaired [for purposes of Section 1129(b)] if the alteration of the rights in question arises solely from the debtor's exercise of discretion … Section 1129(a)(10) recognizes impairment only to the extent that it is caused by economic need.)

Based on this approach, confirmation of a chapter 11 plan is denied where certain *de minimis* claims were artificially impaired for the purpose of contriving a class to accept the plan. *In re Combustion Engineering, Inc.*, 391 F.3d at 243–44 (impairment is artificial where a plan proposes an insignificant or *de minimis* impairment to engineer literal compliance with § 1129(a)(10) while avoiding opposition to reorganization by truly impaired creditors).

### I.    The Plan is Not Feasible - 11 U.S.C. § 1129(a)(11)

65.    Section 1129(a)(11) of the Bankruptcy Code requires that, as a condition precedent to confirmation, a court determine that a plan is feasible.  The standard for feasibility is one of reasonableness.  Under Section 1129(a)(11), a plan is feasible if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor unless such liquidation or reorganization is proposed in the plan."

66.    This test requires the Court to find a "reasonable assurance of  compliance with plan terms and a reasonable assurance that the plan can be effectuated."  *In re Valley View Shopping Ctr., L.P.*, 260 B.R. 10, 33 (Bankr. D. Kan. 2001).

67.    The purpose of the feasibility standard is "to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."  *Matter of Pizza of Hawaii, Inc*. 761 F.3d 1374, 1382 (9th Cir. 1985).   A plan is not rendered feasible merely based on the sincerity, honesty and willingness of the plan proponents.  *In re Rack Engineering Co*., 200 B.R. 302, 305 (Bankr. W.D. Pa. 1996) (refusing to confirm plan of reorganization that did not properly allow for unforeseen events).

68.    In determining whether a plan can reasonably be carried out, courts have identified the following factors: (i) the adequacy of the debtor's capital structure; (ii) the earning power of its business; (iii) economic conditions; (iv) the ability of the debtor's management; (v) the probability of the continuation of the same management; and (vi) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.   *In re Prussia Assocs., L.P.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005); *Rack Engineering,* 200 B.R. at 305.

69.    Feasibility includes finding that the plan provides reasonable assurance that the debtor will remain viable for a reasonable period of time. *In re American Family Enterprises, Inc.*, 256 B.R. 377, 404 (D. N.J. 2000).  In assessing feasibility, a court must make an informed judgment that embraces all facts relevant to the debtor's future earning capacity and hence to its present worth, including the nature and condition of the debtor's properties, the debtor's past earnings record, and all circumstances indicating whether that record is a reliable criterion of future performance. *In re Settlers' Housing Service, Inc.*, 505 B.R. 483 (Bankr. N.D. Ill. 2014); *see also In the Matter of Sound Radio, Inc*. 103 B.R. 521, 524 (D. N.J. 1989) (In remanding bankruptcy court finding as to feasibility, district court found that "[a]ll income projections must be based on concrete evidence of financial progress, and must not be speculative, conjectural or unrealistic … [and] the bankruptcy judge must be satisfied that the proponent will have available credit and the ability to meet capital expenditures …. While the … proponents submitted a financial plan and testimony was presented supporting its accuracy, the Bankruptcy Court's opinion makes no explicit finding as to whether the debtor's profits will enable it to service the debtor's concededly large debt over a reasonable time").

70.    Consideration of such factors and the proponents' burdens in this case demonstrates that there is a little likelihood that the Plan can be effectuated.  The Debtors are not adequately capitalized and, as demonstrated by the monthly operating reports, have no cash other than what is provided to them by their non-debtor affiliates.

71.    The ability to raise the cash necessary to fund the Plan is suspect at best, given the Debtors' demonstrated inability to close the sale transactions on which they are relying to fund some of the payments; reliance on as yet nonexistent DIP financing first promised to the Court on March 29, 2016 in the Debtors' response to the Motion to Dismiss; and, in some instances,

reliance on non-existent sales contracts involving non-debtors not bound to the Plan and whose financial condition, assets and viability are not before this Court.  No information is provided as to the Debtor's valuation of TD's collateral or past earnings records.  No information is provided regarding the non-debtors or their assets that are to be utilized to fund the Plan.

72.     In addition, on information and belief, the Debtors are relying on the same management that has heretofore been unable to consummate the proposed business plan and has been ultimately responsible for the financial reporting in this case.

73.     The Court should also consider that the Debtors are not proposing to pay to TD out of monthly cash flows, but rather in lump sums (i.e., balloon) payments over several years. With respect to balloon payments, courts consider whether the creditor's security, in some form, will outweigh its owed, proposed debt at the time of the balloon payment.  *In re Geijsel*, 480 B.R. 238, 256 (Bankr. N.D. Tex. 2012); *In re Briscoe Enters., Ltd., II,* 994 F.2d 1160, 1166 (5th Cir. 1993).

74.     That is, the court should consider whether the Debtors can sell the property and fully pay-off the secured creditor.  *Geijsel,* 480 B.R. at 256; *see also Trenton Ridge,* 461 B.R. at 494 (quoting *F.H. Partners, L.P. v. Inv. Co. of the Sw., Inc. (In re Inv. Co. of the Sw., Inc.*), 341 B.R. 298, 316 (10th Cir. BAP 2006)) ("[T]he court does need some evidence, whether it be formal projections, or otherwise, to explain how those balloon payments are to be reasonably funded").

75.     Here, the Debtors are not proposing full payoff.  Rather, they propose that the remaining payments will come from the development of such projects as Roesville Estates, and only after the repayment of the "DIP."

76.     Finally, the Court should consider the reasonableness of the projections.   To determine whether the projections supporting a plan are reasonable, the Court will "analyze the [debtors'] projected income and expenses in relation to actual past performance[,]" *In re Am. Trailer & Storage, Inc.,* 419 B.R. 412, 423 (Bankr. W.D. Mo. 2009), as well as its present performance.

77.     Here, the projections provide little detail and even less assurance that they can be accomplished.   Indeed, there are no current or historical metrics against which the proposed performances by these Debtors can be measured.   Hence, the projections present little more than overly optimistic visionary scheme and should not be given much, if any, credence.

78.     The projections also fail to in any way account for negative contingencies that inevitably will arise given the nature of real estate development and property sales.

**J.      The Plan Cannot be Crammed Down - 11 U.S.C. § 1129(b)(2)**

79.     Section 1129(b) of the Bankruptcy Code provides that, where all of the applicable confirmation requirements of Section 1129(a) (other than subsection 1129(a)(8)) are satisfied, the Court, on request of the plan proponent, shall confirm the plan if it does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interest that is impaired under, and that has not accepted, the plan.  *See*  11 U.S.C.§ 1129(b).

80.     Here, the Plan is not fair and equitable in its treatment of TD and should not be crammed down over its objection.

81.     In its pertinent part, Section 1129(b)(2) provides:

(2)  For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A)  With respect to a class of secured claims, the plan provides—

(i)   (I)   that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II)   that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii)   for the sale, subject to Section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii)   for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C.§ 1129(b)(2)(A).

82.     Applied here, the Plan proposes that TD be repaid through sales of certain non-debtor properties and the development and sale of others.  It does not provide for the retention of the Bank's liens; the ability of the Bank to credit bid on the sales of the various properties; cash payments of at least the allowed amount of the TD Claim; or the realization by the Bank of the indubitable equivalent of its claim.[9]

83.     Further, inasmuch as the Plan is not feasible, it can neither be fair nor equitable. Indeed, if "a debtor's proposal to pay a lender over an extended repayment period is not feasible, then it cannot be fair and equitable – at least not in the broad, nontechnical sense of that term – to allow the debtor to attempt to repay the lender over the extended period.  *In re Trenton Ridge Inv'rs, LLC*, 461 B.R. 440, 503-04 (Bankr. S.D. Ohio 2011).

---

[9] The Plan also contemplates the equity holders retaining their interests without infusing any additional funds into the Debtors in violation of the absolute priority rule.

84.     There is simply no reasonable probability that the Bank will receive the payments provided for in the Plan.   The Plan is not feasible for the reasons previously set forth and therefore unfair and inequitable.

85.     It is also unfair and inequitable to shift all of the Plan's risks to TD.  *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 168 (Bankr, D. N.J. 2010) (to be fair and equitable, the plan "must not unduly shift the risk of failure to the secured creditor").  The Debtors offer nothing by way of cash infusion, payment of taxes, or even payment of unsecured creditors in the near term. Under these circumstances it cannot be said that this Plan is fair or equitable.

### K.     Single Asset Real Estate Debtors Should Not Get Multiple Attempts at Plan Confirmation

86.     As single asset real estate debtors and consistent with the mandate of  Section 362(d)(3), the Debtors are required to reorganize expeditiously to avoid foreclosure.  *See* 11 U.S.C. § 362(d)(3)(A) (requiring debtor file a plan of reorganization within 90 days of the order for relief "that has a reasonable possibility of being confirmed within a reasonable time"); s*ee also In re MDM Golf of Gillette Ridge, LLC*, 2014 WL 7359077 (Bankr. D. Conn. 2014) (the debtor failed to meet its burden of proving that its plan had a reasonable possibility of being confirmed within a reasonable period of time under § 362(d)(3)(A) by failing to establish feasibility or break down expenses in sufficient detail to determine their reasonableness, including revenue projections which were entirely speculative, and presenting no credible evidence of the ability to obtain necessary financing).

87.     To that end, placeholder or bare bones plans and disclosure statements are not appropriate in SARE cases.[10]  *In re RYYZ, LLC*, 490 B.R. 29 (Bankr. E.D.N.Y. 2013) (separate

---

[10] Section 362(d)(3) affords the debtor with a second option which has the effect of maintaining the stay and providing the debtor a longer period within which to formulate a plan.  *See* 11 U.S.C. § 362(d)(3)(B).  That option, which requires the Debtor to make monthly interest payments to TD, was not selected here.

stay relief provision applicable in single asset real estate cases is not as elastic as applied to Section 362(d)(2), and does not permit a wait-and-see approach).

88.     Here, the Plan is, as detailed herein, fraught with deficiencies that are not curable let alone within a reasonable time as required.  Indeed, given the dearth of meaningful information, lack of disclosures and its reliance on the often promised but yet-to-be-delivered DIP financing – for which the Debtors must seek the Court's approval on notice to creditors, the Plan and disclosure statement amount to nothing more than placeholders in a veiled attempt to satisfy the requirements of Section 362(d)(3).

89.     As such, the Debtors should not be afforded an opportunity to cure the Plan's labyrinth of deficiencies while TD remains handcuffed, interest and taxes continue to accrue further eroding the value of TD's collateral, and no payments are made to TD.

**WHEREFORE**, TD respectfully requests entry of an Order (i) denying confirmation of the Plan; (ii) granting the Motion to Dismiss; and (iii) affording TD such other further relief deemed just and proper.

Dated: July 1, 2016                          Respectfully Submitted,

                                                 **DILWORTH PAXSON LLP**

                                                 By: /s/ Scott J. Freedman
                                                      Brett Wiltsey (BW6614)
                                                      Scott J. Freedman (SF7681)
                                                      Benjamin W. Spang (BS3439)
                                                      457 Haddonfield Road, Ste. 700
                                                      Cherry Hill, NJ 08002
                                                      Telephone: (856) 675-1900
                                                      Facsimile: (856) 663-8855

                                                 *Attorneys for TD Bank, N.A.*